The following constitutes
the order of the court. Signed December 21, 2015

William J. Lafferty, III
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re | No. 12-46834 |
| Jorge Edgard Quinones,<br>Lidia Delvalle Quinones, | Chapter 7 |
|            Debtors. | |
| The Board of Trustees, in their capacities as<br>Trustees of the Laborers Health and Welfare<br>Trust Fund for Northern California, et al. | Adv. Pro. No. 13-04015 |
|            Plaintiffs, | |
|            v. | |
| Jorge Edgard Quinones,<br>Lidia Delvalle Quinones, | |
|            Defendants. | |
| The Board of Trustees, in their capacities as<br>Trustees of the Cement Masons Health and<br>Welfare Trust Fund for Northern California,<br>et al. | Adv. Pro. No. 13-04016 |
|            Plaintiffs, | |
|            v. | |
| Jorge Edgard Quinones,<br>Lidia Delvalle Quinones, | |
|            Defendants. | |

## MEMORANDUM OF DECISION REGARDING PLAINTIFFS' MOTIONS TO DISMISS ADVERSARY PROCEEDINGS AND DEFENDANTS' COUNTER MOTIONS FOR ORDERS DETERMINING PREVAILING PARTY

### I.  Introduction and Summary of Disposition

Plaintiffs filed the above-captioned adversary proceedings against Defendants to have certain debts declared nondischargeable pursuant to § 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code.[1]  During the pendency of the adversary proceedings, the Court of Appeals for the Ninth Circuit decided the case of *Bos v. Board of Trustees*, 795 F.3d 1006 (9th Cir. 2015), effectively determining the vast majority of the § 523(a)(4) claims in favor of Defendants.

After the Court granted Defendants' motions requesting summary adjudication (collectively, the "*Motions for Summary Adjudication*") in both of the adversary proceedings with respect to all but a miniscule amount of the damages sought by Plaintiffs under § 523(a)(4), Plaintiffs decided to forego their fraud claims under § 523(a)(2)(A) and their other tort claims under § 523(a)(6), for which a trial had been scheduled to commence within days.  Instead, Plaintiffs filed in each adversary proceeding a *Motion to Dismiss Adversary Proceeding* (collectively, the "*Motions to Dismiss*") pursuant to Federal Rule of Bankruptcy Procedure 7041, which incorporates Federal Rule of Civil Procedure 41.  Defendants opposed the *Motions to Dismiss*, arguing that dismissal would prejudice their legal interests because they had prevailed in their *Motions for Summary Adjudication*, and they were prepared immediately to go to trial on the remaining claims, on which they were confident of prevailing.

Consistent with their opposition to the *Motions to Dismiss*, and in an attempt to establish a right to attorneys' fees and costs, Defendants filed a *Counter Motion for Order Determining Prevailing Party* in each of the adversary proceedings (collectively, the "*Counter Motions Re Prevailing Party*").[2]  The *Counter Motions Re Prevailing Party* requested the Court determine that Defendants had prevailed not only on the § 523(a)(4) claims, but also on the § 523(a)(2)(A)

---

[1] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.
[2] The Quinoneses also filed a *Counter Motion for Sanctions* pursuant to Federal Rule of Bankruptcy Procedure 9011 in each of the adversary proceedings (collectively, the *Sanctions Motions*).  The Court is disposing of the *Sanctions Motions* via the *Memorandum Regarding Defendants' Counter Motions for Sanctions*, issued concurrently.

and (a)(6) claims asserted by Plaintiffs. Further, Defendants claimed a right to attorneys' fees pursuant to the language of the agreements between the parties, and the provisions of California Code of Civil Procedure ("Cal. CCP") § 1021 and California Civil Code ("Cal. Civ. Code") § 1717. Plaintiffs opposed the *Counter Motions Re Prevailing Party* on the grounds that Defendants did not prevail on the § 523(a)(2)(A) and (a)(6) claims, that the grounds asserted for recovery of attorneys' fees were inapplicable to these adversary proceedings, and that applicable provisions of the Labor Management Relations Act ("LMRA") preempted any recovery provided under state law.

On October 19, 2015, the Court heard the *Motions to Dismiss* and the *Counter Motions Re Prevailing Party* and took the matters under submission at the conclusion of the hearing. For the reasons set forth below, the Court determines that it should: (1) enter judgments in favor of Defendants with respect to the § 523(a)(4) claims, (2) grant the *Motions to Dismiss* with respect to the § 523(a)(2) and (a)(6) claims, (3) grant the *Counter Motions Re Prevailing Party* with respect to costs incurred on the § 523(a)(4) claims, and (4) deny the *Counter Motions Re Prevailing Party* with respect to any claims for attorneys' fees.

## II.     Background[3]

### A. The Bankruptcy Case

On August 16, 2012, Defendants-Debtors Jorge and Lidia Quinones ("Jorge" or "Lidia", collectively the "Quinoneses") commenced the underlying bankruptcy case by filing a voluntary Chapter 11 petition in their individual capacities. Prior to the commencement of the case, and

---

[3] These matters are being disposed of in large part via Motions to Dismiss pursuant to Federal Rule of Bankruptcy Procedure 7041, which incorporates Federal Rule of Civil Procedure 41(b). It follows that there has been no trial, and therefore no determination of disputed facts in these matters. And the summary disposition of the § 523(a)(4) claims pursuant to FRCP 56 did not, as a matter of law, involve the weighing of disputed facts. Accordingly, the "background" relevant to a determination of the matters before the Court is for the most part procedural history of these adversary proceedings, and not the "underlying facts" in a traditional sense—and the "Background" section of this Memorandum is accordingly so focused. However, in those instances in which the Court must refer to certain background facts of these matters, they are largely taken from the *Initial Complaints* and *First Amended Complaints* filed by Plaintiffs, for the following two reasons: First, as will be made apparent during the discussion of Defendants' arguments for attorneys' fees pursuant to Cal. Civ. Code § 1717, the question whether an action is "on a contract" begins and essentially ends with consideration of the claims asserted by Plaintiffs. Second, the Court notes that there was no source of background facts for these matters outside of the *Initial Complaints* and the *First Amended Complaints*, Defendants having neither presented their case at trial, nor, more importantly, presented any meaningful recitation of their view of the "facts" of these matters via their *Motions to Dismiss*, their *Answers* or their entirely conclusory *Motions for Summary Judgment*.

2

continuing during their tenure as debtors-in-possession, the Quinoneses owned and operated a number of construction-related businesses, the most pertinent of which, for these purposes, was Professional Construction Services ("PCS"). PCS was a sole proprietorship of Jorge, although Lidia served as office manager for PCS, with responsibility for, among other things, paying certain expenses and reporting hours worked under the terms of a Collective Bargaining Agreement ("CBA") with the various employee benefit trusts. The Quinoneses' operations in Chapter 11 were unsuccessful, and relatively short-lived. On October 17, 2012, the case was converted to Chapter 7.

**B. The Adversary Proceedings**

On January 17, 2013, Plaintiffs, the Boards of Trustees of various employee benefit trust funds[4] (collectively, the "Boards") filed the above-captioned adversary proceedings (collectively, the "APs").

**1. The Complaints**

Plaintiffs' initial *Complaint to Determine Certain Debt to be Nondischargeable* filed in each of the APs (collectively, the "*Initial Complaints*") contained the following allegations:

The Plaintiff in each AP is the Board of Trustees for the respective trust funds administered by the Laborers Trust (the "Laborers Trust Funds") and the Cement Masons Trust (the "Cement Masons Trust Funds" and, collectively with the Laborers Trust Funds, the "Trust Funds"). The Trust Funds are multi-employer employee benefit plans established under a written Trust Agreement (each a "Trust Agreement", and collectively, the "Trust Agreements") subject to and pursuant to § 302 of the LMRA, 29 U.S.C. § 185, and §§ 3, 4 and 502 of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1002, 1003 and 1132. The Boards are each empowered to bring an action in the name of their respective Trust Funds pursuant to

---

[4] The Boards of Trustees filed these adversary proceedings in their capacity as Trustees of the Laborers Health and Welfare Trust Fund for Northern California, the Laborers Vacation-Holiday Trust Fund for Northern California, the Laborers Pension Trust Fund for Northern California, the Laborers Training and Retraining Trust Fund for Northern California, the Cement Masons Health and Welfare Trust Fund for Northern California, the Laborers Vacation-Holiday Trust Fund for Northern California, the Cement Masons Pension Trust Fund for Northern California, and the Cement Masons Apprenticeship and Training Trust Fund for Northern California.

3

express provisions contained in the Trust Agreements. *Complaint to Determine Certain Debt to be Nondischargeable* ¶ 3, 13-04015 and 13-04016, Jan. 17, 2013, ECF No. 1.

Each of the Trust Funds is a third party beneficiary of a collective bargaining agreement[5] that requires contributions to be paid for the purpose of providing pension, health, and other benefits on account of work performed or paid for thereunder. *Id*. at ¶ 4. A copy of the relevant Master Agreement was attached to each of the *Initial Complaints*.

The *Initial Complaints* further alleged that Jorge was the owner, sole proprietor and operator of PCS, and stated that Lidia was named in the proceeding because each of the Boards was informed and believed that she was a co-owner of PCS. *Id.* at ¶6.

Jorge has done business as a contractor in California, has been an employer within the meaning of ERISA, and qualifies as an employer in an industry affecting commerce within the meaning of the LMRA. *Initial Complaints* ¶ 7.

The respective Master Agreements, and Trust Agreements that are incorporated by reference into the Master Agreements, provide for prompt payment of employer contributions to the Trust Funds. The Master Agreements also require prompt payment of all delinquent contributions, plus interest, attorneys' fees and other collection costs, and for employer audits as needed by the Trust Funds. *Id.* at ¶ 9.

The *Initial Complaints* also asserted that the Quinoneses failed, neglected, or refused to make timely contributions to the Trust Funds as required by the respective Master Agreements and the Trust Agreements, in unknown amounts to be proven, but amounting to at least $183,875.63 with respect to the Laborers Trust Fund and at least $116,090.80 with respect to the Cement Masons Trust Fund. *Id.* at ¶ 11.

The Trust Agreements also provide, at Article IV, § 3, for attorneys' fees and costs in the event of default:

> If any Individual Employer defaults in the making of such Contributions or payments and if the Board consults or causes to be consulted legal counsel with respect thereto, there shall be added to the obligation of the Individual Employer

---

[5] These agreements were referred to in each of the *Initial Complaints* as the "Master Agreement", and will be so referred to here (or, collectively, the "Master Agreements").

who is in default, reasonable attorneys fees, court costs and all other reasonable expenses incurred in connection with such suit or claim, including any and all appellate proceedings therein.

Trust Agreement, Art. IV, § 3, 13-04015 and 13-04016, Jan. 17, 2014, ECF No. 1, Ex. C. Accordingly, the Boards each sought damages attributable to auditors' fees, attorneys' fees and costs as permitted by the applicable Trust Agreements.

As part of the *Initial Complaints*, the Boards made the following allegations with respect to § 523(a)(2)(A), (a)(4), and (a)(6):

(a) Section 523(a)(2)(A): Fraud and False Pretenses

The Boards alleged that the Quinoneses did not intend to perform or knew that they would not be able to perform their obligations under the respective Master Agreements and the Trust Agreements when they entered into them. Despite their intentions and/or knowledge, the Quinoneses benefitted from the labor necessary to perform work under PCS's contracts with third parties. The Boards further alleged that the Quinoneses knowingly and repeatedly failed to report all hours worked under the respective Master Agreements (or otherwise under-reported their obligations under the Master Agreements). The Boards alleged that because the Quinoneses failed to report honestly all hours worked by their employees, it follows that they knowingly failed to pay the amounts due under the Master Agreements. *Complaint to Determine Certain Debt to be Nondischargeable* ¶¶ 17-23, 13-04015 and 13-04016, Jan. 17, 2013, ECF No. 1.

(b) Section 523(a)(4): Fraud or Defalcation by Fiduciaries, Embezzlement and Larceny

The Boards asserted that pursuant to the provisions of the respective Master Agreements and the incorporated Trust Agreements, the Quinoneses were fiduciaries with respect to all amounts due and to be due as contributions. The Quinoneses' failure to remit timely and faithfully such amounts due constituted fraud or defalcation by fiduciaries, as well as embezzlement and larceny. *Complaint to Determine Certain Debt to be Nondischargeable* ¶¶ 24-34, 13-04015 and 13-04016, Jan. 17, 2013, ECF No. 1.

(c) Section 523(a)(6): Willful and Malicious Damage to Property

5

The Boards lastly asserted that in failing to honor their obligations under the respective Master Agreements and the Trust Agreements, the Quinoneses willfully and maliciously caused damage to the property of the Trust Funds. *Complaint to Determine Certain Debt to be Nondischargeable* ¶¶ 35-40, 13-04015 and 13-04016, Jan. 17, 2013, ECF No. 1.

Assisted by prior counsel, the Quinoneses filed answers to the *Initial Complaints* on March 27, 2013.[6]

After initial discovery and lengthy discussions with the parties, the Court granted the Boards' *Motion to Amend Complaint*. On April 11, 2014, the Boards timely filed an amended complaint in each of the APs (together, the "*First Amended Complaints*"). As a general matter, the *First Amended Complaints* added factual background concerning Lidia's activities in connection with various businesses owned and operated by the Quinoneses, including her conduct in connection with the compilation and reporting of data related to the hours allegedly worked by covered employees for PCS.

The *First Amended Complaints* also included additional information and allegations concerning both Lidia and Jorge's alleged misuse of funds generated by the various businesses to pay expenses not related to those businesses, and other acts that constituted co-mingling of assets between and among the various businesses.

More specifically, the Boards alleged that the Quinoneses used revenues derived from contracts for which covered employees performed services, that should have been used to make required contributions, to pay expenses unrelated to the contracts involved for the benefit of other Quinones-controlled entities. That background provided additional support for the nondischargeability claims under § 523(a)(2), (a)(4) and (a)(6).[7]

### 2. The Quinoneses' Motion for Summary Adjudication

On July 2, 2015, the Quinoneses filed their *Motion for Summary Adjudication* (each a "*MSA*", collectively the "*MSAs*") in each of the APs. On July 30, 2015, the Ninth Circuit Court

---

[6] At the outset of these APs, the Quinoneses were represented by Julia P. Gibbs. On November 13, 2013, David Chandler, the Quinoneses' current counsel, substituted in to these matters.

[7] In addition, the Boards added facts that they believed supported a claims of nondischargeability, pursuant to § 523(a)(2), of the Quinoneses' withdrawal liability caused by PCS's cessation of business.

6

of Appeals decided *Bos v. Board of Trustees*, 795 F.3d 1006 (9th Cir. 2015). On July 31, 2015, the Court issued a memorandum concerning the issuance of the *Bos* decision and requested the parties be prepared to address the significance of *Bos* at the hearing on the *MSAs*.

On August 12, 2015, the Court conducted a hearing on the *MSAs* and took the matters under submission, although with a strong indication that it was likely to grant the *MSAs* at least with respect to employer contributions (as opposed to employee contributions, which the Ninth Circuit did not address in *Bos*). On August 25, 2015, while the *MSAs* were under submission, the Boards filed their *Motions to Dismiss*, thereby foregoing any relief on their claims under § 523(a)(2)(A) and (a)(6).

On September 15, 2015, the Court issued its *Memorandum* explaining the reasons for granting, in large part, the Quinoneses *Motions for Summary Adjudication*. *See Memorandum*, 13-04015, Sept. 15, 2015, ECF No. 136; *Memorandum*, 13-04016, Sept. 15, 2015, ECF No. 121. The Court determined that pursuant to the ruling in *Bos*, the Quinoneses were entitled to summary judgment on the § 523(a)(4) claims related to defalcation while acting in a fiduciary capacity respecting employer contributions, because *Bos* determined that no matter the language of the respective Trust Agreements or Master Agreements that purported to define plan assets or to establish who could be a fiduciary, neither the obligation to make a contribution nor a defaulted contribution could satisfy the requirements of § 523(a)(4). *Memorandum*, 13-14, Sept. 15, 2015, ECF No. 136.

For similar reasons, and also because the issue of the applicability of the *Bos* decision to embezzlement and larceny claims under § 523(a)(4) had been directly addressed at oral argument on the *MSAs*, the Court determined that *Bos* also established that there could be no liability against the Quinoneses based on embezzlement or larceny. The Court reserved the question of the proper characterization of employee contributions, which was not addressed in any of the moving or responsive pleadings on the *MSAs* nor by *Bos*.

Rather than pursue the claims under § 523(a)(2) and (a)(6), the Boards filed *Motions to Dismiss* the remaining claims. On September 23, 2015, the Quinoneses filed oppositions to the *Motions to Dismiss* and also filed the *Counter Motions Re Prevailing Party*. The *Counter*

*Motions Re Prevailing Party* sought a ruling that the Quinoneses had prevailed on all of the claims asserted in the APs.

On October 19, 2015, the Court heard argument on the *Motions to Dismiss* and the *Counter Motions Re Prevailing Party*. Upon conclusion of the hearing, the Court took the matters under submission. The Court now issues this Memorandum to resolve these matters.

## III.    Analysis

**A. The Boards Motions to Voluntarily Dismiss**

The Boards moved to dismiss their *First Amended Complaints* pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7041, which incorporates Federal Rule of Civil Procedure ("FRCP") 41. The Quinoneses opposed the *Motions to Dismiss* on the grounds that they will suffer legal prejudice if the actions are dismissed, both because the dismissal will not achieve finality for the Quinoneses' purposes and because dismissal at this stage would frustrate the Quinoneses' attempts to demonstrate that they were the prevailing party in these actions for purposes of pursuing a claim for attorneys' fees.

Federal Rule of Civil Procedure 41 allows plaintiffs voluntarily to dismiss an action. FRCP 41(a)(1)(A) allows a plaintiff to dismiss an action without a court order by filing a notice of dismissal "before the opposing party serves either an answer or a motion for summary judgment" or a stipulation of dismissal. Where dismissal without a court order is not available, a plaintiff may nonetheless voluntarily dismiss the action by obtaining a court order. *See* Fed. R. Civ. P. 41(a)(2). Voluntary dismissal under Rule 41(a)(2) is "on terms that the court considers proper." *Id.*

In deciding a motion for voluntary dismissal, the Court "must consider whether the defendant will suffer some plain legal prejudice as a result of dismissal." *Hamilton v. Firestone Tire & Rubber Co., Inc.*, 679 F.2d 143, 145 (9th Cir. 1982). Legal prejudice is "prejudice to some legal interest, some legal claim, [or] some legal argument." *Smith v. Lenches*, 263 F.3d 972, 976 (9th Cir. 2001) (internal quotations omitted). Legal prejudice does not occur when the defendant merely "faces the prospect of a second lawsuit or when [the] plaintiff merely gains

8

some tactical advantage." *Hamilton*, 679 F.2d at 145. Typically, no legal prejudice will result where the plaintiff seeks to dismiss the action with prejudice. *See Smith*, 263 F.3d at 976 (finding the defendant would not suffer legal prejudice were the plaintiff to dismiss federal claims with prejudice, even where the defendants would be required to defend related state law claims in state court).

The Quinoneses assert three grounds of legal prejudice to their rights based on uncertainty concerning the finality of the dismissal of these actions.

First, the Quinoneses argue that the Boards' dismissal of these actions is not with prejudice, and they therefore could be forced to defend these actions again. While the language of the *Motions to Dismiss* might not have been as explicit and unambiguous as the Quinoneses might have liked, the Boards' reply brief made it absolutely clear that the dismissal is *with* prejudice, and the Boards' counsel confirmed that position at oral argument on October 19. As stated above, when a dismissal is made with prejudice it is virtually certain that it should be granted. *See Smith*, 263 F.3d at 976.

Second, the Quinoneses complain that the dismissals would not resolve issues related to potential withdrawal liability.[8] That may be true, but it is irrelevant: the possibility of post-dismissal actions against the Quinoneses based on withdrawal liability is the result of the Court's prior rulings concerning the post-petition nature of withdrawal liability in the factual context of this case, and has nothing to do with Plaintiffs' proposed dismissal of these APs. *See Hamilton*, 679 F.2d at 145.

Third, the Quinoneses argue that dismissal will not entirely resolve issues between themselves and the Boards because they will leave open the possibility that the Quinoneses will be indirect targets of actions that the Boards may bring against entities and companies that the Quinoneses control, and assert alter ego claims against those entities or the Quinoneses. This argument is unavailing for several reasons.

---

[8] Briefly stated, withdrawal liability may be assessed against a party to a CBA upon cessation of the company's business in the industry affected. In the particular context of construction contracts, it occurs when a party obligated on a CBA covering work in that industry terminates and later resumes their activity in the industry. Withdrawal liability seeks to compensate the affected trust fund for the additional costs and expenses that will not be paid as a consequence of the withdrawing company's cessation of business. 29 U.S.C. § 1383(b).

As an initial matter, the Boards' reply briefs disclaim any interest in pursuing such claims. As the Boards also point out, the entities that had been controlled or owned by the Quinoneses are now owned or controlled by the chapter 7 trustee, they have no assets, and they have, and will have, no operations. In sum, it would simply be irrational for the Boards to pursue any such claims. Lastly, the entirely speculative and economically irrational potential for claims against entities or companies formerly owned or controlled by the Quinoneses is simply not the sort of "legal prejudice" that should deter the Court from dismissing the APs. *See Hamilton*, 679 F.2d at 145.

In addition to these arguments about finality, the Quinoneses also argue that it would be inequitable and inappropriate to grant the *Motions to Dismiss* because they have prevailed on the § 523 claims, and should be permitted to seek attorneys' fees.[9] In support of this argument, the Quinoneses point out that they obtained summary adjudication with respect to virtually all § 523(a)(4) claims, and that they were ready, willing and able to try, and in their minds, completely defend, the claims based on § 523(a)(2)(A) and (a)(6).

The Court believes that the Quinoneses have raised a valid point with respect to the § 523(a)(4) claims. In contrast to the § 523(a)(2)(A) and (a)(6) claims, for which there was not even a pending request for a determination at the time the *Motions to Dismiss* were filed, the Court determined essentially the entirety of the § 523(a)(4) claims in favor of the Quinoneses and against the Boards. The Court entered a *Memorandum of Decision* and *Order Granting Summary Adjudication* in each AP with respect to any aspect of the § 523(a)(4) claims that dealt with employer contributions, determining, adversely to the Boards, all questions concerning defalcation or fraud while acting in a fiduciary capacity, embezzlement, or larceny.

The only portion of the Quinoneses' potential § 523(a)(4) liability that the Court did not decide concerned required employer contributions (an issue not reached by *Bos*), the potential amount of which the parties agreed during the argument on the *MSAs* was relatively miniscule. Offered a chance to establish and "prove up" the amount of any such liability, the Boards more

---

[9] The Quinoneses also point out that premature dismissal of these actions might prejudice the determination of their *Motions for Sanctions*.

10

than once declined to do so, most recently at the October 19 hearing. The Boards' reluctance to pursue these remaining claims might have been motivated by the relative unimportance, economically, of damages related to employer contributions, or they might have been motivated by the Quinoneses continuing and rigorous denial of any such liability. In any event, the Court is convinced that under all of these circumstances the correct and appropriate result with respect to the § 523(a)(4) claims would be to have the Court amend its prior *Orders Granting Summary Adjudication* to judgments on the entirety of the § 523(a)(4) claims, something the Court clearly retains the power to do under FRCP 54(b). Fed. R. Civ. Pro. 54(b) ("any order or other decision...that adjudicates fewer than all the claims…may be revised at any time before the entry of a judgment adjudicating all the claims").

Accordingly, the Court will deny the Boards' *Motions to Dismiss* with respect to the § 523(a)(4) claims and will enter a judgment for the Quinoneses with respect to each of those claims. With respect to the § 523(a)(2)(A) and the (a)(6) claims, however, for which there has been no determination concerning the Quinoneses liability, and indeed, without dispositive motions having been presented, and without a trial, no occasion for a final disposition, the Court concludes that it is appropriate to grant the *Motions to Dismiss*. The Court will deal below with the question to what extent, and for what purposes, the Quinoneses may be deemed to be the prevailing parties in these matters, and the implications therefor under applicable law. For these purposes, it is enough to note that the Quinoneses have raised arguments about their entitlement to fees and costs, and it is appropriate to condition the dismissals of the § 523(a)(2)(A) and (a)(6) claims on the Court first determining the Quinoneses' *Counter Motions Re Prevailing Party* as the Court does below.[10] *See* Fed. R. Civ. P. 41(a)(2).

**B. The Quinoneses Request for Fees and Costs**

The Quinoneses' *Counter Motions Re Prevailing Party* asserted both that the Quinoneses actually prevailed on all claims asserted in the *First Amended Complaints*, and that they are entitled to recover (a) their costs under FRBP 7054, and (b) attorneys' fees, based on (i) the provisions of Cal. Civ. Code § 1717 which, in some circumstances, renders unilateral fee

---

[10] The Court also determines the Quinoneses' *Motions for Sanctions* in the concurrently filed memorandum.

Case: 13-04016    Doc# 144    Filed: 12/21/15    Entered: 12/21/15 15:29:39    Page 12 of 38

provisions in contracts reciprocal,[11] (ii) the provisions of § 1021 of the Cal. CCP, which enforces the language of a contract concerning attorneys' fees, and (iii) the provisions of FRBP 7037, concerning entitlement to attorneys' fees for certain violations of the discovery rules.

The Quinones contend that they prevailed on all of the § 523 claims asserted. The Boards disagree. As will be discussed below, as a matter of federal law applicable to adversary proceedings (FRBP 7054), the Quinones appear to have prevailed on the § 523(a)(4) claims, and are entitled to recover their costs thereon. As a matter of applicable non-bankruptcy law, here California state law, it appears that the Quinones have prevailed on all claims asserted as a matter of entitlement to recover their costs.[12] Cal. CCP § 1032 (a)(10). Whether those costs may include reasonable attorneys' fees depends on the language of the contract pursuant to Cal. CCP §§ 1033.5 and 1021, or on whether there is a basis to impose fees in an action on contract pursuant to some other statutory provision, here Cal. Civ. Code § 1717.

## 1. Federal Law Bases for Costs and Attorneys' Fees.

### a. Costs Pursuant to FRBP 7054

The Quinones have asked for recovery of their costs in these APs pursuant to FRBP 7054. FRBP 7054 (Judgments; Costs) provides as follows:

> Costs; Attorneys Fees.
>
> Costs Other Than Attorneys Fees. The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise applies.

Fed. R. Bankr. P. 7054(b)(1).

To the Court's knowledge, there is no statute of the United States or provision of the FRCP or FRBP that would prohibit the recovery of costs in these APs, to the prevailing party.

---

[11] This argument is based on language in the Master Agreements and Trust Agreements that would permit the Board (but not the Quinones) to recover fees in these actions, and the prevalence of the Master Agreements and the Trust Agreements in the determination of these APs.

[12] California Code of Civil Procedure § 1032(a)(4) defines "[p]revailing party" to include "a defendant in whose favor a dismissal is entered . . . a defendant as against those plaintiffs who do not recover any relief against the defendant." It appears that the Quinones would have had a colorable claim for costs under Cal. CCP § 1032(a)(4) as to all claims brought in the Boards complaints, but the Quinones did not move for costs under that provision. As a result, the Court will not consider further whether the Quinones would be entitled to costs under that provision and will not award the Quinones costs under that provision.

Case: 13-04016    Doc# 144    Filed: 12/21/15    Entered: 12/21/15 15:29:39    Page 13 of 38

There is little doubt that, as to the § 523(a)(4) claims that are being reduced to judgments, the Quinoneses are the prevailing parties within the meaning of the rule. *See In re Dunston*, 146 B.R. 269, 276 (D. Colo. 1992) (obtaining a nondischargeability judgment under § 523(a)(2)(A) qualified as prevailing). This conclusion results from the language of the rule, which concerns "Judgments", indicating that parties with favorable judgments have "prevailed" for purposes of the rule. And there being no other definition of "prevailing party" in FRBP 7054, this result also comports with a common sense interpretation of the term.

Conversely, the Court does not believe it appropriate, in the absence of entry of a judgment, or any other favorable determination of the § 523(a)(2) and (a)(6) claims, and in the absence of a definition or term of art in the FRBP or FRCP that would expand the term "prevailing party" beyond those who have obtained a favorable judgment, to deem the Quinoneses to be prevailing parties on the § 523(a)(2) and (a)(6) claims, in the meaning required by FRBP 7054(b). *See In re Northwestern Corp.*, 326 B.R. 519, 529 (Bankr. D. Del. 2005) (finding that there was no prevailing party where the litigation was terminated without a trial on the merits); *see also In re Robertson*, 105 B.R. 504, 507 (Bankr. D. Minn. 1989) (objecting creditor may have caused debtors to dismiss case, but it was not a prevailing party because the court never ruled on the merits of the objection).

Accordingly, the Court will award the Quinoneses their costs on account of the § 523(a)(4) claims, subject to further motion on notice, as provided by FRBP 7054(b)(1).

### b. Attorneys' Fees Pursuant to FRBP 7037(c)(1)

The Quinoneses claim a right to attorneys' fees under FRBP 7037. Federal Rule of Bankruptcy Procedure 7037 incorporates FRCP 37. Federal Rule of Civil Procedure 37(c)(1) provides "[i]f a party fails to provide information or identify a witness," the party will not be allowed to use such information or witness at any hearing or trial. In addition to, or instead of, that sanction, the Court *may* order payment of reasonable expenses, including attorneys' fees, caused by the failure. Fed. R. Civ. P. 37(c)(1)(A).

The Quinoneses assert that the Boards failed to supplement certain responses to discovery requests, which the Quinoneses assert caused them additional expense. The Court

13

will not grant any fees based on these assertions. First, the Boards are not attempting to use any information or witnesses not previously disclosed—and the Quinoneses have not identified any particular instances in which the Boards are attempting to use such previously withheld information. Rather, the Boards are voluntarily dismissing the bulk of their claims, a self-imposed sanction that is no less draconian than the most drastic remedy allowed by the rule. The Court is not required to award any additional fees on such a matter, under the circumstances presented, including the Quinoneses failure to point to any specific violation of the rule or the actual expenditures incurred in consequence of the violation, the Court declines to do so.

## 2. Attorneys' Fees under California Law

Under the "American rule" parties to litigation bear their own costs, including attorney's fees. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The prevailing party in litigation "is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Id.* The default rule can be overcome by statute. *See Travelers Cas. And Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 449, 127 S.Ct. 1199, 1204, 167 L.Ed.2d 178 (2007). There is no general right to attorneys' fees in the Bankruptcy Code. *In re Baroff*, 105 F.3d 439, 441 (9th Cir. 1997).

Bankruptcy courts, however, may award attorneys' fees in § 523 actions where state law authorizes such an award. *Cohen v. de la Cruz*, 523 U.S. 213, 223, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *see also Travelers*, 549 U.S. at 451-52, 127 S.Ct. at 1205-06 (prevailing party has a claim for attorneys' fees if permitted by applicable state law, regardless of fact that fees were incurred litigating issues of federal bankruptcy law). In their *Counter Motions Re Prevailing Party*, the Quinoneses assert that they are entitled to recover their costs and attorneys' fees under California law.

As an overview of the controlling law in California, Cal. CCP § 1032 provides that "a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." *See Santisas v. Goodin*, 17 Cal.4th 599, 606 (1998). Section 1033.5 of the Cal. CCP provides that attorneys' fees qualify as "costs" for purposes of Cal. CCP § 1032 when authorized by contract,

Case: 13-04016    Doc# 144    Filed: 12/21/15    Entered: 12/21/15 15:29:39    Page 15 of 38

statute, or other law. *See id.*; *see also In re Deuel*, 482 B.R. 323, 327 (Bankr. S.D. Cal. 2012). The Quinoneses cite Cal. CCP § 1021, which authorizes an award of attorneys' fees as agreed upon by the parties, and Cal. Civ. Code § 1717 as the independent basis upon which they are entitled to an award of attorneys' fees as litigation costs under Cal. CCP § 1032.

### a. California Code of Civil Procedure § 1021

Section 1021 of the Cal. CCP provides that unless attorneys' fees are "specifically provided for by statute," the compensation of attorneys "is left to the agreement, express or implied, of the parties." The Quinoneses have not pointed to any statutory provision that specifically authorizes an award of attorneys' fees. In the absence of a statute authorizing an award of attorneys' fees, the Court may award attorneys' fees under Cal. CCP § 1021 only if an agreement between the parties provides for such an award. *See 3250 Wilshire Blvd. Bldg. v. W.R. Grace & Co.*, 990 F.2d 487, 489 (9th Cir. 1993). Where there is an agreement between the parties, the Court looks to the language of that agreement to determine whether the moving party is entitled to attorneys' fees or costs. *Id.*

Article IV, § 3 of the Trust Agreements, which is incorporated into the Master Agreements, provides for "reasonable attorney fees, court costs and all other reasonable expenses incurred in connection with [a] suit or claim" against an employer regarding a default in the making of contributions to the trusts. *See* Trust Agreement, Art. IV, § 3, 13-04015 and 13-04016, Jan. 17, 2014, ECF No. 1, Ex. C. The Trust Agreements' unilateral fee provision contemplates an award of attorneys' fees to the Boards when they take legal action to enforce their rights against an employer. Article IV, § 3 does not entitle employers, such as the Quinoneses, to recover attorneys' fees and costs in litigation with the Boards and the Quinoneses have failed to direct the Court to any other provision of the Trust Agreement that would support such an award. Consequently, the Court is not authorized to award the Quinoneses attorneys' fees under Cal. CCP § 1021. *See 3250 Wilshire Blvd. Bldg.*, 990 F.2d at 489.

15

### b. California Civil Code § 1717

#### i. Introduction

The Quinoneses also invoked Cal. Civ. Code § 1717 ("§ 1717") as a basis to award attorneys' fees. California Civil Code § 1717(b)(1) authorizes an award of attorneys' fees "in any action on a contract" to "the party prevailing on the contract." Cal. Civ. Code § 1717(b)(1).

The focus of this discussion will be the Boards' § 523(a)(4) claims, as opposed to the Boards' claims under § 523(a)(2)(A) and (a)(6), because attorneys' fees may not be awarded under § 1717 where the underlying claims have been voluntarily dismissed. *See* Cal. Civ. Code § 1717(b)(2); *see also In re Brosio*, 505 B.R. 903, 912 (9th Cir. 2014); *Santisas v. Goodin,* 17 Cal. 4th 599, 612-13 (1998). Section 1717(b)(2) provides that "[w]here an action has been voluntarily dismissed . . . there shall be no prevailing party for purposes of this section." As discussed above, the Boards are being permitted to dismiss the § 523(a)(2) and (a)(6) claims. Therefore, § 1717(b)(2) precludes an award of attorneys' fees under that section with regard to the claims that were voluntarily dismissed. *See In re Brosio*, 505 B.R. at 912. For that reason the Quinoneses' request for fees under § 1717 with regard to the § 523(a)(2) and (a)(6) claims is denied and the discussion proceeds with an analysis of the Quinoneses claim for attorneys' fees with regard to the § 523(a)(4) claims.[13]

The Boards opposed the *Counter Motions Re Prevailing Party*, which requested an award of attorneys' fees under § 1717. The Boards' primary argument in opposition is that the § 523(a)(4) nondischargeability claims were not actions on a contract within the meaning of § 1717, and instead were tort-like actions that arose from alleged bad conduct of the Quinoneses.

---

[13] While that rule might seem arbitrary, it articulates a clearly-defined policy in favor of treating more expansively claims based on a contract, but only when the party seeking such a right has clearly and definitively prevailed on the contract. *Santisas*, 17 Cal. 4th at 606-07. That rule is hardly unfair in these cases. In contrast to the Court's prior determination of the § 523(a)(4) claims, there was no determination of any sort of the § 523(a)(2)(A) and (a)(6) claims, unless one considers the Court's prior determinations to *deny* numerous motions to dismiss all claims and motions requesting summary adjudication previously brought by the Quinoneses. Indeed, at the time of the filing of the Boards' *Motions to Dismiss*, there were not even dispositive motions on file concerning the § 523(a)(2) and (a)(6) claims. The Quinoneses' theories about the relationship of the § 523(a)(6) claim to the § 523(a)(4) claims that were determined adversely to the Boards, and the insufficiency of the § 523(a)(2) claims are just that—theories. The Court never determined these issues, and will not join the Quinoneses in speculating as to what the Court would have determined, without the benefit of the Boards even being permitted to respond to the Quinoneses' assertions.

16

Relying in part on the Ninth Circuit's recent decision in *Penrod*, the Quinoneses countered with the proposition that the Boards put forward a provision of the respective Master Agreements in order to satisfy an essential element of the claims and, therefore, made the actions ones on a contract. *See In re Penrod*, 802 F.3d 1084, 1087-88 (9th Cir. 2015). For a number of reasons, explained in greater detail below, the Court disagrees with the Quinoneses and finds that § 1717 is inapplicable to the APs.

Among other requirements, a prerequisite to an award of attorneys' fees under § 1717 is that the underlying action be "on a contract." *Id.* A matter is on a contract if it is an action "to enforce, or avoid enforcement of, the provisions of a contract." *Id.* at 1088. Determining whether an action is "on a contract" requires consideration of the nature of the claims at issue, taking into account the elements of the claims and what the effect of a judgment on the claims would be.

When addressing § 1717 issues and interpreting the phrase "action on a contract," bankruptcy courts must look to California state law. *See In re Penrod*, 802 F.3d at 1087-88 (9th Cir. 2015) (analyzing California law when determining whether the action at issue was "on a contract"); *see also In re Charalambous*, 2013 WL 3369299, *4 (9th Cir. BAP 2013) ("Here, the applicable, 'substantive, nonbankruptcy law, is California state law."). State law distinguishes between actions on a contract and tort claims, which generally arise from bad actions that are separate and apart from the provisions of a contract. *Super 7 Motel Assoc. v. Wang*, 16 Cal.App.4th 541, 549 (1993). Judgments on tort claims typically do not have the effect of enforcing, or avoiding enforcement of, any provisions of a contract.

*Penrod* clarified the analysis, but does not change the substance of the analysis for purposes of these proceedings and does not change the result here. 802 F.3d at 1087-89. Despite the Quinoneses' protestations that the Boards asserted terms of the Master Agreement as the basis for the § 523(a)(4) claims, the claims for fraud or defalcation while acting in a fiduciary capacity, embezzlement, and larceny are more akin to state law tort claims and, as is typically the case with such claims, are not seeking to enforce, or prevent enforcement of, any

provisions of the Master Agreements. Therefore, the Quinoneses' claims for fees under § 1717 fail because the actions were not "on a contract."

### ii. Elements of a § 1717 Claim for Attorneys' Fees

The relevant portion of § 1717 provides:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717.

Section 1717 applies to make unilateral fee provisions, ones that provide the right to fees to one party but not the counterparty, reciprocal. *See In re Penrod*, 802 F.3d at 1087 (citing *Santisas v. Goodin*, 17 Cal.4th 599, 610 (1998)). As the California Supreme Court noted, "[t]he primary purpose of [§] 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." *Santisas v. Goodin*, 17 Cal.4th 599, 610 (1998).

For § 1717 to provide the basis for awarding attorneys' fees, three conditions must be satisfied. *In re Penrod*, 802 F.3d at 1087. First, "the contract must contain a provision stating that attorney's fees incurred to enforce the contract shall be awarded either to one of the parties or to the prevailing party." *Id.* Second, "the action in which the fees are incurred must be an action 'on a contract.'" *Id.* Finally, "the party seeking fees must be the party who 'prevail[ed] on the contract." *Id.*

### (a) The Contract Awards Fees to One of the Parties

The first issue to address is whether the Master Agreements signed by the parties awards fees to one of the parties or the prevailing party. *Id.* Article IV, § 3 of the Trust Agreements, which were incorporated into the Master Agreements, allows an award of attorneys' fees to the Boards for fees incurred in connection with a suit or claim regarding unpaid contributions. These APs sought to establish the nondischargeability of a debt for unpaid contributions to the various employee benefit trust funds. The Quinoneses defaulted on the agreement by failing to

18

make contributions. The Boards incurred attorneys' fees in connection with the actions regarding the debt that resulted from that default. Thus, the fee provision in the Master Agreement would authorize an award of attorneys' fees to the Boards in these APs.

The fee provision is unilateral in that it authorizes an award of attorneys' fees to the Boards only. Section 1717 operates to make unilateral fee provisions reciprocal, in effect authorizing an award of attorneys' fees to the party excluded from a unilateral fee provision if the contract would allow for an award of attorneys' fees to the non-excluded party under the same circumstances. *See Santisas*, 17 Cal.4th at 610. The Court may award the Quinoneses attorneys' fees as the prevailing party, provided the other requirements of § 1717 are satisfied, because under the terms of the Master Agreement, the Boards would be entitled attorneys' fees were their respective positions reversed. *See In re Penrod* 802 F.3d at 1087; *see also Santisas*, 17 Cal.4th at 610.

### (b) The Actions were not on a Contract

The second issue to address is whether the Boards' § 523(a)(4) claims for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" were actions on the Master Agreements. It must be stated at the outset that California courts liberally interpret the phrase "on a contract" when considering whether a party is entitled to attorneys' fees under § 1717. *In re Baroff*, 105 F.3d 439, 442 (9th Cir. 1997). In order for an action to be "on a contract" it must "contain at least one contract claim." *Santisas*, 17 Cal.4th at 615. An action contains a contract claim and, therefore, is "on a contract" where "a party seeks to enforce, or avoid enforcement of, the provisions of the contract." *In re Penrod*, 802 F.3d at 1088 (citing *City of Emeryville v. Robinson*, 621 F.3d 1251, 1267 (9th Cir. 2010)).

For purposes of the "on a contract" determination, it is of no consequence whether the action is decided by resolving factual issues relating to the interpretation of the contract or by resolving purely legal questions decided under federal law. *See id.* As the Court of Appeals for the Ninth Circuit noted in *Penrod*:

> Nothing in the text of § 1717 limits its application to actions in which the court is
> required to resolve disputed factual issues relating to the contract. A party who

19

> obtains (or defeats) enforcement of a contract on purely legal grounds, as by prevailing on a motion to dismiss with prejudice or by showing that a defendant's contract-based defenses are barred by federal statute or federal common law, still prevails in an action "on a contract."

*Id.* Further, the Court is not to consider the source of law that provides the rule of decision, whether common law principles of contract interpretation or substantive provisions of the Bankruptcy Code. *Id.* The fact that the Boards' § 523(a)(4) claims were brought under the Bankruptcy Code and were decided on a motion for summary adjudication as a matter of substantive federal law is inconsequential to the § 1717 inquiry.

Instead, the Court must consider the nature of the § 523(a)(4) claims. *In re Giusto*, 532 B.R. 760, 768 (N.D. Cal. 2015) ("In determining whether an action is on a contract for purposes of [§ 1717], the proper focus is not on the nature of the remedy, *e.g.*, equitable relief, but on the basis of the cause of action."). In determining whether the actions were "to enforce, or avoid enforcement of, the provisions of the contract," the Court must ask what the parties are seeking to accomplish in the action and what the Court would be required to find in order to grant the relief requested. *See In re Penrod*, 802 F.3d at 1088.

When analyzing the Boards' § 523(a)(4) claims, it is useful to distinguish the fraud or defalcation while acting in a fiduciary capacity portion of the claims from the embezzlement and larceny portions. Accordingly, the Court will start its analysis with the fraud or defalcation claims because it was the primary basis for the Boards' § 523(a)(4) actions.

### (1) Fraud or Defalcation While Acting in a Fiduciary Capacity

In order to prevail on a nondischargeability action based on fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4) a plaintiff must establish that "(1) an express trust existed, (2) the debt was caused by fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *In re Utnehmer*, 2013 WL 5573198, *5 (9th Cir. BAP 2013) (quoting *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir. 1997)).

In these APs, summary adjudication was granted in favor of the Quinoneses because the Boards failed, as a matter of law, to establish the existence of an express trust. *In re Quinones*,

20

537 B.R. 942, 949 (Bankr. N.D. Cal. 2015).  In order to establish an express trust the debtor must act as a fiduciary of the creditor and the fiduciary relationship must predate the fraud or defalcation.  *See Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1190 (9th Cir. 2001). An individual is a fiduciary for purposes of § 523(a)(4) if the individual is a fiduciary under ERISA.  *See id.*  ERISA defines a fiduciary as an individual who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets."  28 U.S.C. § 1002(21)(A)(I). Under ERISA, an individual is a fiduciary if she functions as a fiduciary by exercising authority or control over plan assets.  *See In re Luna*, 406 F.3d 1192, 1201 (9th Cir. 2005).  An individual may become a fiduciary under ERISA's functional definition even if she is not a signatory to the agreement and is not named as a fiduciary in the agreement.  *Id.* ("individuals [who are not named fiduciaries] may acquire fiduciary status if they exercise the fiduciary functions set forth in ERISA.").

The Court of Appeals for the Ninth Circuit held that unpaid contributions by employers to employee benefit funds are not considered assets of the plan, and therefore are not held in trust by the employer for purposes of § 523(a)(4).  *See Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000).  The Boards proceeded on a theory, supported by cases finding an exception to *Cline*,[14] that the contract defined the plan's assets to include unpaid contributions and by exercising control over unpaid contributions the Quinoneses were acting as fiduciaries of the trust funds for purposes of ERISA and § 523(a)(4). During the pendency of these APs, the Ninth Circuit's opinion in *Bos* directly addressed the issue of whether an employer is a fiduciary of an employee benefit plan with respect to unpaid employer contributions where the Trust Agreements define the plan's assets to include future payments.  795 F.3d 1006, 1009-11 (9th Cir. 2015).  The Ninth Circuit held that even if a plan "could convert an unpaid contribution into some type of plan asset," the control of a plan asset required to establish a fiduciary relationship under ERISA and § 523(a)(4) is absent.  *Id.*

---

[14] *See, e.g., Board of Trustees v. River View Constr.*, 2013 WL 2147418, at *6 (N.D. Cal. Apr. 17, 2013); *Trustees of S. Cal. Pipe Trades Health & Welfare Trust Fund v. Temecula Mech., Inc.*, 438 F. Supp. 2d 1156, 1165 (C.D. Cal. 2006).

21

Relying on the holding in *Bos*, this Court granted the Quinoneses' *MSAs* with regard to the unpaid employer contributions, finding that as a matter of law the Quinoneses were not fiduciaries and, therefore, the Boards could not establish the existence of an express trust. *In re Quinones*, 537 B.R. at 949.

If the Boards' § 523(a)(4) claims had survived the summary judgment stage and they established the existence of a trust relationship, the Court would have considered whether the Quinoneses' conduct rose to the level of fraud or defalcation. To show fraud under § 523(a)(4) the Boards would have been required to prove that: (1) the Quinoneses "made a misrepresentation, concealment, or non-disclosure of a material fact;" (2) the Quinoneses knew the representation was false or the disclosure was materially incomplete; (3) the Boards justifiably relied on the misrepresentation or omission; and (4) the Boards suffered damage as a result. *In re Honkanen*, 446 B.R. 373, 383 (9th Cir. BAP 2011).

Defalcation requires "a breach of fiduciary duty and wrongful intent." *In re Maxwell*, 509 B.R. 286, 289 (Bankr. E.D. Cal. 2014). A breach of fiduciary duty occurs when a fiduciary misappropriates trust assets or fails to account for such assets. *In re Hemmeter*, 242 B.R. at 1190 (9th Cir. 2001). The wrongful intent required for defalcation is intentional wrongdoing. *Bullock v. BankChampaign, N.A.*, -- U.S. --, 133 S.Ct. 1754, 1759, 185 L.Ed.2d 922 (2013). Intentional wrongdoing encompasses "not only conduct that the fiduciary knows is improper but also reckless conduct." *Id.* A fiduciary acts recklessly where he "consciously disregards . . . a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Id.* (internal quotations omitted). In order to succeed on their defalcation claims, the Boards would have been required to show not only that the Quinoneses breached a fiduciary duty owed to the trust funds, but that the breach was knowing or the result of reckless conduct.

Through the § 523(a)(4) actions the Boards were seeking to establish that debts, which would otherwise be discharged in the bankruptcy, should be excepted from discharge. The debts would be excepted from discharge if the Boards showed that the debts were for the Quinoneses' fraud or defalcation while acting in a fiduciary capacity. In order to prevail the Boards were required to show that the Quinoneses occupied the status of a fiduciary, pursuant to

22

an express trust, and then took some bad action, arising to the level of fraud or defalcation. *See In re Utnehmer*, 2013 WL 5573198, *5. The entitlement to a judgment excepting the debts from discharge under § 523(a)(4) would not have arisen from any provision of the contract, but instead would have arisen, if at all, from the misconduct of the Quinoneses, namely intentional misrepresentation or intentional wrongdoing in breach of a fiduciary duty. Such bad conduct, which is the predicate to a § 523(a)(4) judgment, is wholly separate and apart from any provision of the contract.

The distinction between the misconduct at issue in the Boards' § 523(a)(4) actions and an action seeking to enforce the provisions of the contract is further borne out by examining the issues actually in dispute during the litigation. Neither party disputed the enforceability of the relevant provisions of the Master Agreement. Neither party disputed that the Quinoneses had an obligation to make contributions to the employee benefit trust funds and breached that obligation by failing to make the payments. Although the parties may quibble about the exact amount of the debts owing, the underlying basis for the debts the Quinoneses owe to the Boards is not disputed. What was at issue was whether subsequent alleged bad acts of the Quinoneses, in light of the position the Quinoneses held vis-à-vis the Boards, entitled the Boards to a judgment establishing that the debts are nondischargeable.

Such actions were not to enforce, or prevent enforcement, of any provision of the contract, but instead were causes of action independent of the contract's provisions and independent of any rights or obligations of the parties under the contract. The § 523(a)(4) claims are more akin to a classic tort action for fraud that happens to arise from a contractual relationship. *See Super 7 Motel Assoc.*, 16 Cal.App.4th at 549 ("[A]n action for fraud seeking damages sounds in tort, and is not 'on a contract' for purposes of an attorney fee award, even though the underlying transaction in which the fraud occurred involved a contract containing an attorney fee clause."); *see also Moallem v. Coldwell Banker Commercial Group, Inc.*, 25 Cal.App.4th 1827, 1830 (1994). California courts have consistently held that breach of fiduciary duty and fraud claims, although arising out of and related to a contractual relationship, are actions sounding in tort and, therefore, are not actions "on a contract" within the meaning of

23

§ 1717. *See Smith v. Home Loan Funding, Inc.*, 192 Cal.App.4th 1331, 1337 (2011); *see also Loube v. Loube*, 64 Cal.App.4th 421, 430 (1998); *Moallem*, 25 Cal.App.4th at 1830.

In *Moallem* a jury rendered a verdict against the defendant, a real estate broker, on the plaintiff's negligence and breach of fiduciary duty claims. 25 Cal.App.4th at 1830. The plaintiff then moved for attorneys' fees under § 1717, citing a unilateral fee provision in the brokerage agreement. *Id.* The trial court refused to award attorneys' fees under § 1717. *Id.* On appeal, the California Court of Appeals noted that in light of the plain language of the statute, § 1717 "has consistently been held not to afford recovery of fees for tort claims arising out of or related to such a contract," including breach of fiduciary duty claims. *Id.*

The courts in *Loube*, 64 Cal.App.4th at 430, and *Smith*, 192 Cal.App.4th at 1337, reaffirmed the statement in *Moallem*, indicating that claims for breach of fiduciary duty, misrepresentation, and professional negligence are not actions "on a contract." In *Smith*, the Court of Appeals upheld an award of attorneys' fees under § 1717 on a claim for breach of the implied covenant of good faith and fair dealing, while also acknowledging that "a prevailing party cannot recover fees for actions based on tort including breach of fiduciary duty and misrepresentation." 192 Cal.App.4th at 1337. In *Loube*, the Court of Appeals reversed an award of attorneys' fees to the party that prevailed on a professional negligence claim. 64 Cal.App.4th at 430. The court held that although "appellant's claim for legal negligence arose from the relationship between them, which relationship was founded on a contract, the cause of action sounded in tort and was no more 'on the contract' than a claim for breach of fiduciary duty or for fraud involving a contract." *Id.*

The Boards' actions for fraud or defalcation while acting in a fiduciary capacity are analogous to those state court cases holding that state law claims for fraud and breach of fiduciary duty, although arising out of a contractual relationship between the parties, are not themselves actions "on a contract." *See Smith*, 192 Cal.App.4th at 1337; *see also Loube*, 64 Cal.App.4th at 430; *Moallem*, 25 Cal.App.4th at 1830. In a § 523(a)(4) action, as is the case in a state law action for fraud or breach of fiduciary duty, the contract forms the basis for the relationship, establishing the rights and obligations of the parties, but the claim is for

24

wrongdoing by one of the parties that is distinct from the contractual obligations and, thus, gives rise to separate cause of action that can be distinguished from an action to enforce the provisions of the contract. This is especially true when, as is the case here, the action seeks to establish monetary damages and the nondischargeability of a claim in bankruptcy, as opposed to another remedy, such as rescission, that would have the effect of defeating enforcement of the contract. *See In re Baroff*, 105 F.3d at 443 (explaining that an action seeking money damages for fraud is not an action on a contract, while "[a]n action to avoid or rescind an agreement because of fraudulent inducement, on the other hand, is an action on a contract within the meaning of [§] 1717."). For that reason, these actions for fraud or defalcation while acting as a fiduciary are not actions "on a contract," despite the fact that the Boards relied on a contractual relationship as the basis to establish the requisite express trust.

The Ninth Circuit's recent decision in *Penrod* provides another useful point of comparison. The debtor in *Penrod* bought a Ford Taurus for $25,000. 802 F.3d at 1085. To fund the purchase the debtor borrowed $32,000 to account for the negative equity in her old vehicle, which was worth $6,000 and on which she owed $13,000. *Id.* The debtor filed a chapter 13 bankruptcy case and listed the debt owed to the creditor as $26,000. *Id.* at 1085-86. The chapter 13 plan filed by the debtor bifurcated the creditor's claim into a secured claim for $16,000 and an unsecured claim for the remaining $10,000. *Id.* at 1086. The creditor objected to confirmation of the plan and, citing the hanging paragraph following § 1325(a)(9), asserted that its entire claim should be treated as secured. *Id.* The bankruptcy court ruled for the debtor and that decision was upheld after several levels of appellate review. *Id.* The debtor then moved for an award of attorneys' fees under § 1717. The bankruptcy court denied the debtor's motion for attorneys' fees "on the ground that [the debtor] did not prevail 'on the contract' because her success in the litigation with [the creditor] turned on a question of federal bankruptcy law." *Id.* at 1087.

The Ninth Circuit reversed the bankruptcy court's ruling. *Id.* at 1089. The Ninth Circuit found that the creditor "insisted that it was entitled to have its claim treated as fully secured [and the] only possible source of that asserted right was the contract—in particular, the

25

provision in which [the debtor] granted a security interest in her Taurus to secure 'payment of all you owe on this contract.'" *Id.* at 1088. The Ninth Circuit went on to state that the security granted by the contract covered the purchase price of the new vehicle and the funds borrowed to refinance the negative equity in the old vehicle. *Id.* The "sole issue" in the litigation was whether that contract provision "should be enforced according to its terms, or whether its enforceability was limited by bankruptcy law to exclude the negative equity portion of the loan." *Id.* Therefore, the court concluded, the action was "on a contract" because "[b]y prevailing in the litigation, [the debtor] obtained a ruling that precluded [the creditor] from fully enforcing the terms of the contract." *Id.*

By contrast, no provision of the Master Agreement was asserted by the Boards as the basis for establishing the debts nondischargeable or by the Quinoneses as the basis for defeating the Boards' claims. The sole issue in these APs was whether the debts that would otherwise be discharged in the bankruptcy should be excepted from discharge due to the Quinoneses fraud or defalcation while acting as fiduciaries. In *Penrod*, the Bankruptcy Code operated to defeat the effect of the security agreement. *Id.* Here, the Bankruptcy Code provides the rule of decision, as was the case in *Penrod*, but the source of the right asserted by the Boards—to have a debt excepted from discharge—arises from the alleged bad conduct of the debtors, not from any provision of the contract. *Id.* A judgment in these APs would not have had the effect of preserving or defeating any right of the parties under the contract, as was the case with the security agreement in *Penrod* that provided for the entire claim to be secured by the new vehicle. *Id.* Rather, the judgment sought here would have had the effect of altering the default outcome under the Bankruptcy Code.

The Quinoneses argue in support of their request for attorneys' fees that the Boards have asserted their rights under the Master Agreements as the basis for the relief requested from the outset. According to the Quinoneses, the Boards made these actions "on a contract" by putting forth a theory that placed contractual provisions in a place of central and critical importance. The Boards did point to the Master Agreement to supply a definition of plan assets that included unpaid contributions, which in turn would, under the Boards' theory, be utilized in determining

26

whether the Quinoneses were fiduciaries under ERISA. However, using a definitional provision in the contract as a tool to interpret the definition of fiduciary under ERISA, which in turn is used to determine whether an employer is a fiduciary purposes of § 523(a)(4), does not make these actions on a contract. The significance of the sole contract provisions at issue was attenuated from the crux of the § 523(a)(4) claims. The limited utility of the definitional provision at issue to the Boards' overall theory of the case comes into focus when considering the proof required to prevail on a fraud or defalcation claim under § 523(a)(4), which more closely resembles the proof required for the common law torts of fraud and breach of fiduciary duty than a contract action. *See Smith*, 192 Cal.App.4th at 1337; *see also Loube*, 64 Cal.App.4th at 430; *Moallem*, 25 Cal.App.4th at 1830.

While these APs were pending the Ninth Circuit issued a decision in *Bos*, which clarified that typical employers are not fiduciaries with regard to unpaid employer contributions for purposes of ERISA, despite contractual attempts to define plan assets to include unpaid contributions. 795 F.3d at 1011. *Bos* further emphasized the limited impact of contractual provisions on the § 523(a)(4) analysis. *Id.* After *Bos,* the provisions of the contract, including any attempts to define plan assets to include unpaid contributions as a workaround of the limitations in *Cline*, are inconsequential to the outcome of a fiduciary fraud or defalcation claim. *Id.*

In these § 523(a)(4) actions for fraud or defalcation while acting in a fiduciary capacity the Boards sought to except a debt for unpaid contributions to various employee benefit trust funds from discharge. The right to a judgment in such actions arises from misconduct on the part of the debtor, arising to the level of intentional misrepresentation or wrongdoing, which occurred while the debtor was acting as a fiduciary of the plaintiff. The misconduct at issue is unrelated and distinct from any rights or obligations that arise from the contract. A successful action would have had the effect of excepting a debt from discharge, altering the typical outcome under the Bankruptcy Code. A successful action would not have had the effect of preserving or defeating any contractual right or obligation. As a result, the Boards' actions for fraud or defalcation are not actions "to enforce, or avoid enforcement of, the provisions of the

27

contract." *In re Penrod*, 802 F.3d at 1088. Therefore, the § 523(a)(4) actions are not "on a contract" and the Quinoneses are not entitled to attorneys' fees under § 1717 with regard to this portion of the claims.

### (2) Embezzlement and Larceny Claims

The other bases for a § 523(a)(4) claim are embezzlement and larceny. The Boards also sought to except the debt for unpaid contributions from discharge on those bases. The Quinoneses were granted summary judgment with regard to both of those claims. Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895). In order to succeed on an embezzlement claim, the creditor must show: "(1) property rightfully in possession of a non-owner; (2) non-owner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991) (quoting *In re Hoffman*, 70 B.R. 155, 162 (Bankr. W.D. Ark. 1986)) (internal quotations omitted). Larceny is defined as a "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." *In re Ormsby*, 591 B.R. 1199, 1206 (9th Cir. 2010) (quoting 4 *Collier on Bankruptcy* ¶ 523.10[2] (15th ed. rev. 2008)) (internal quotations omitted). "Larceny is distinguished from embezzlement in that the original taking of the property was unlawful." *In re Montes*, 177 B.R. 325, 332 (C.D. Cal. 1994).

When interpreting § 523(a)(4), bankruptcy courts look to federal law to define embezzlement and larceny. *See In re Ormsby*, 591 B.R. 1199, 1206 (9th Cir. 2010); *In re Wada*, 210 B.R. 572, 575 (9th Cir. BAP 1997). Both embezzlement and larceny are claims borrowed from criminal law and adopted by the Bankruptcy Code. *See Moore*, 160 U.S. at 269, 16 S.Ct. 294, 40 L.Ed. 422; *see also In re Wada*, 210 B.R. at 575. When used in the civil context they take the form of tort claims. *See In re Mickens*, 312 B.R. 666, 676 (Bankr. N.D. Cal. 2004). Neither the Boards nor the Quinoneses asserted any provision of the Master Agreement in support or in defense of the embezzlement and larceny claims. A judgment on the claims would not have the effect of enforcing, or preventing enforcement of, provisions of

28

the contract.  *In re Penrod*, 802 F.3d at 1088.  A judgment on the embezzlement or larceny claims arises from independent bad acts of the defendant and has the effect of establishing rights of the parties irrespective of any rights or obligations on a contract.  Therefore, the Boards' actions under § 523(a)(4) for embezzlement and larceny are not actions "on a contract" and cannot serve as the basis for attorneys' fees under § 1717.

**C. The Labor Management Relations Act's Preemptive Effect**

As demonstrated above, there is no independent basis under the Bankruptcy Code to award the Quinoneses attorneys' fees in the APs, and the only basis even arguably available under applicable non-bankruptcy law, § 1717, does not apply to these APs.  However, even if the Court's analysis concerning this issue were erroneous and § 1717 were available to make reciprocal a contract provision that was drafted unilaterally, the doctrine of federal preemption would prohibit the application of § 1717.

**1. The Doctrine of Preemption**

Preemption is "a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl.2, invalidates state laws that 'interfere with or are contrary to, federal law.'" *Baker & Drake, Inc. v. Public Service Commission of Nevada (In re Baker & Drake, Inc.)*, 35 F.3d 1348 (9th Cir. 1994) (quoting *Hillsborough County v. Automated Medical Labs, Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)).  The crux of any preemption analysis is to consider the "intent and sweep" of the federal statute.  *Baker & Drake*, 35 F.3d at 1352; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86, 116 S.Ct. 2240, 135 L.Ed.2d. 700 (1996) (finding that the purpose of Congress is the ultimate touchstone in every preemption case).

A statute's preemptive intent may be either express or implied.  *Baker & Drake*, 35 F.3d at 1352-53; *In re Pacific Gas & Electric Company*, 273 B.R. 795 (Bankr. N.D. Cal. 2002). Express preemption occurs when Congress authors federal statutes with explicit preemptive language, thus leaving little doubt as to intent.  *See Hillsborough County*, 471 U.S. at 713. Absent any explicit preemptive language, however, Congressional intent must be implied.  *Id.* Implied preemption can occur in two ways: field preemption and conflict preemption.  Field preemption occurs when "the scheme of federal regulation is sufficiently comprehensive to make

29

reasonable the inference that Congress 'left no room' for supplementary state regulation" or when the "the federal interest is so dominant that it will be assumed to preclude enforcement of state laws on the same subject." *Id.* Conflict preemption arises when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*; *see also Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898-99, 90 L.Ed.2d 369 (1986).

In these APs only conflict preemption is at issue. Neither party has asked the Court to consider either express preemption or field preemption. Furthermore, the Boards' counsel emphasized at trial that the LMRA's preemptive effect over § 1717 was implied.

### 2. The Labor Management Relations Act

Section 301 of the LMRA provides, in pertinent part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

The Boards assert that by incorporating the Trust Agreements governed by the LRMA to the Master Agreements, the Master Agreements were also brought under the purview of the LMRA. Therefore, argue the Boards, even if the Court found that any of the causes of action in these APs constituted an action "on a contract," the LMRA's preemptive effect would eliminate any basis for attorneys' fees imposed under state law—here, § 1717.

The Quinoneses oppose the Boards' preemption argument on two theories. First, the Quinoneses argue that federal laws do not have a general preemptive effect over state laws in every instance. The Quinoneses support their argument by citing to dicta from the Supreme Court's decision in *Allis-Chalmers Corp v. Lueck*, stating that "not every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is preempted by § 301." 471 U.S. 202, 211, 105 S.Ct. 202 (1985). Second, the Quinoneses argue

30

that the nature of these APs, which is to determine whether the Boards' claims should be excepted from discharge, is fundamentally different from the preemption analysis expounded by the Ninth Circuit decision in *Roy Allan Slurry Seal v. Laborers Int'l Union of N. Am. Highway & St. Stripers/Rd. & St. Slurry Local Union 1184, AFL-CIO*, 241 F.3d 1142 (9th Cir. 2001). For the reasons that follow, the Court disagrees with both of the Quinoneses theories as to why the LMRA does not preempt § 1717.

### 3. The LMRA Preempts Conflicting State Laws on Awards of Attorneys' Fees

Since there is no general right to attorneys' fees under the Bankruptcy Code, *In re Baroff*, *supra*, 105 F.3d at 442-43, bankruptcy courts must turn to applicable non-bankruptcy law, usually state law, to determine whether a party is entitled to attorneys' fees, *see also In re Coast Trading Co., Inc.*, 744 F.2d 686, 693 (9th Cir. 1984) (finding that "[t]here is no general right to attorneys' fees for actions in bankruptcy. A party may, however, be entitled to attorneys' fees in the bankruptcy proceeding in accord with the applicable state law."). In applying state statutes concerning entitlement to attorneys' fees, bankruptcy courts must analyze state laws in the same manner that state courts would. Consistent with these principles, the Boards provided extensive legal authority for the proposition that the LMRA has a preemptive effect over § 1717. *See Roy Allan Slurry Seal*, 241 F.3d 1142; *see also Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. California*, 463 U.S. 1, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983); *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 82 S. Ct. 571, 7 L. Ed. 2d 593 (1962); *Waggoner v. Nw. Excavating, Inc.*, 642 F.2d 333, 335 (9th Cir. 1981) *cert. granted, judgment vacated on other grounds*, 455 U.S. 931, 102 S. Ct. 1417, 71 L. Ed. 2d 640 (1982).

*Roy Allan*, which the Boards cite as their primary support for the preemption argument, is controlling and binding precedent. 241 F.3d 1142. In *Roy Allan*, the Ninth Circuit held that the LMRA must preempt state laws that award attorneys' fees when they are not provided for in the contract (or as in the case of § 1717 when there is a unilateral fee provision and the state statute makes that provision reciprocal) because federal labor law must be applied with uniformity, and the parties' intent in negotiating the fees provision in the contract must not be disturbed. *Id.* For

Case: 13-04016    Doc# 144    Filed: 12/21/15    Entered: 12/21/15 15:29:39    Page 32 of 38

the same reasons that a state court would be unable to grant attorneys' fees when the LMRA is implicated, this Court is also restricted by the holding in *Roy Allan*. Thus, the Court finds that absent some bankruptcy principle that would require a different outcome, *Roy Allan* compels this Court to conclude that the LMRA preempts the application of § 1717 to disputes between these parties concerning rights to attorneys' fees for actions on a contract.

The Quinoneses' argument that "not every dispute involving a tangential provision of a collective bargaining agreement brings the dispute within the LMRA" is unconvincing. As an initial matter, it bears emphasizing that the Ninth Circuit in *Roy Allan* did *exactly* what the Quinoneses are apparently decrying here—it applied a general provision of the LMRA concerning the right to sue, the proper forum for any such suit, and the source of law for any such suit, as well as a court recognized exception limiting the right to attorneys' fees against the Boards to situations in which they acted in bad faith, to override and void the application of a highly specific provision of state law that, for reasons deemed eminently appropriate under state law, would have expanded the parties' rights under a contract. *See Roy Allan Slurry Seal*, 241 F.3d at 1146-48. It did so precisely because it concluded that the LMRA expressed an overriding need for harmony in the application of federal labor laws, and specifically included the bargained for provisions in labor contracts concerning attorneys' fees. *Id.* at 1146.

Further, the Quinoneses' citation to the Supreme Court's decision in *Allice-Chalmers* to support their argument is unpersuasive—the sentence cited by the Quinoneses from the opinion was not the holding of that case. *See Reply to Opposition to Motion to Determine Prevailing Party* 5, 13-04015, Oct. 13, 2015, ECF. No. 157 (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 212, 105 S.Ct. 1904 (1985)) ("*Reply*"); *Reply to Opposition to Motion to Determine Prevailing Party* 5, 13-04016, Oct. 13, 2015, ECF. No. 141 ("*Reply*"). Rather, the holding of the *Allice-Chalmers* decision was that whenever the resolution of a state law claim is substantially dependent on analyzing the terms of a collective bargaining agreement, that claim must either be treated as a claim under the LMRA or deemed preempted by the LMRA. *See Allis-Chalmers Corp.*, 471 U.S. at 220 (holding that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor

32

contract, that claim must either be treated as a § 301 claim . . . or dismissed as preempted by federal labor-contract law."). The Supreme Court found that the trial court had substantially analyzed the collective bargaining agreement in the case, thereby requiring that the case be brought under the scope of the LMRA. *Id.*

The Quinoneses attempt to avoid this result by claiming that an action pursuant to § 523 is not an action under the LMRA (and the LMRA therefore does not preempt § 1717) confuses the contentions of the parties in this dispute and misses the point about the source of law for attorneys' fees in nondischargeability actions. *See Reply* 4-7, 13-04015, Oct. 13, 2015, ECF. No. 157; *Reply* 4-7, 13-04016, Oct. 13, 2015, ECF. No. 141.

Were the Quinoneses to rely solely on § 523(a), or any other provisions of the Bankruptcy Code to support their claim to attorneys' fees in these matters, the outcome would be swift and definitive—there is no free-standing, independent right to fees under the Code for the claims asserted in the APs.[15] *In re Baroff*, 105 F.3d at 441. As discussed at length above, any right to attorneys' fees in an action under § 523(a) must be derived from applicable non-bankruptcy law. *Cohen*, 523 U.S. at 223. It is exactly because they wish to avoid the principle that there is no general right to attorneys' fees in the Bankruptcy Code that *the Quinoneses—not the Boards*—attempt to invoke state law—here § 1717. And it is the Quinoneses'—not the Boards—who, no doubt in an attempt to hoist the Boards on their own petard, assert that because the Boards relied on a broad interpretation of "plan assets" in the Master Agreements and Trust Agreements to bolster their claims under § 523(a)(4), the Boards' have brought claims under those agreements, making § 1717 applicable.

The Quinoneses argument that the Boards are trying to have it "both ways" is stunningly incorrect. *See Reply* 6, 13-04015, Oct. 13, 2015, ECF. No. 157; *Reply* 6, 13-04016, Oct. 13, 2015, ECF. No. 141. The Boards are not arguing that any of their nondischargeability claims were "on a contract", and the Court has determined that § 1717 is inapplicable to these matters. The Boards are merely arguing, consistent with numerous binding Ninth Circuit opinions, that if

---

[15] The Court is certainly aware that § 523(d) of the Bankruptcy Code provides a right to attorneys' fees to a party who successfully defends an action under § 523(a)(2) based on a *consumer debt*, a condition not present here.

33

any of these actions were "on a contract" in a manner sufficient to invoke § 1717, the LMRA, which governs any contract which could be the predicate for the invocation of § 1717, would necessarily preempt the application of the state statute in these cases.

Rather, it is the Quinoneses who, in an attempt to find some basis for attorneys' fees in these matters, appear alternatively to invoke, and then to disclaim, the applicability of a contract to determine these disputes. For all of the foregoing reasons, such attempts cannot succeed, and the Court concludes that were § 1717 otherwise applicable to award attorneys' fees to the Quinoneses because, among other requirements, these were actions on a contract, the LMRA would preempt the application of that section.

### 4. Attorneys' Fees Cannot Be Granted Under a Bad Faith Basis Either

The applicability of preemption notwithstanding, under the LMRA the Quinoneses could receive an award of attorneys' fees if the Court determined that the Boards acted in bad faith. *See Wellman v. Writers Guild of Am., W., Inc.*, 146 F.3d 666, 674 (9th Cir. 1998) (quoting *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus. Inc.*, 84 F.3d 1186, 1192 (9th Cir. 1996)); *see also In re Fulwiler*, 624 F.2d 908 (9th Cir. 1980) (per curiam) ("Absent bad faith or harassment, attorneys' fees are not available for the litigation of federal bankruptcy issues under a contract which provides for attorneys' fees for enforcement of the contract.").

The Quinoneses argued that the Boards acted in bad faith in these APs by adding allegations concerning Lidia eighteen months after the filing of the *Initial Complaints*, despite the fact that she is not a signatory to their Master Agreement. Presumably, the Quinoneses are arguing that, absent Lidia being a signatory to the Master Agreements there was no basis to assert liability against her. The Court disagrees. There was at least some evidence suggesting there could be viable claims against Lidia under § 523(a)(2)(A), (a)(4), or (a)(6), including allegations that Lidia controlled the pay system for the business and the reporting of amounts due under the Master Agreement. Based on that evidence, it was not inherently implausible for her activities to fit within the meaning of "fiduciary" for purposes of § 523(a)(4), or for her to have made misrepresentations to the Laborers Trust Funds or the Cement Masons Trust Funds, as

required under § 523(a)(2), or for her to have damaged their property interests in the manner and with the intent required under 523(a)(6). *See In re Luna*, 406 F.3d 1192, 1201 (9th Cir. 2005).

Accordingly, the Court finds that the Boards acted within at least viable theories of liability at the time they added Lidia to their *First Amended Complaints*.[16] The Court disagrees with the Quinoneses' request and finds that it was not bad faith for the Boards to move forward with their § 523(a)(4) claims under a theory that was viable prior to *Bos*.

For the reasons stated above, the Court finds that the Ninth Circuit decision in *Roy Allan* precludes an award of attorneys' fees under § 1717 due to the preclusive effect of the LMRA. Furthermore, the Court finds that because the Boards did not act in bad faith there can be no award for attorneys' fees under that basis either.

## IV.    Conclusion

For the reasons stated above,

(1) The Boards' *Motions to Dismiss* are GRANTED, conditioned on the Court retaining jurisdiction to hear and determine the Quinoneses request for attorneys' fees and costs contained in the *Counter Motion for an Order Determining Prevailing Party*.

(2) The Quinoneses' request for costs in the *Counter Motion for an Order Determining Prevailing Party* under Federal Rule of Bankruptcy Procedure 7054(b)(1) is GRANTED as to the costs incurred in connection with their defense of the § 523(a)(4) claims.

(3) The Quinoneses' request for costs in the *Counter Motion for an Order Determining Prevailing Party* under Federal Rule of Bankruptcy Procedure 7054(b)(1) is DENIED as to the costs incurred in connection with their defense of the § 523(a)(2) and (a)(6) claims.

(4) The Quinoneses' requests for attorneys' fees in the *Counter Motion for an Order Determining Prevailing Party* under Federal Rule of Bankruptcy Procedure 7037(c)(1), California Code of Civil Procedure § 1021, and California Civil Code 1717 are DENIED.

---

[16] Further, the Boards' theory was supported by cases that found an exception to the ruling in *Cline*. *See Board of Trustees v. River View Constr.*, 2013 WL 2147418, at *6 (N.D. Cal. Apr. 17, 2013); *Trustees of S. Cal. Pipe Trades Health & Welfare Trust Fund v. Temecula Mech., Inc.*, 438 F. Supp. 2d 1156, 1165 (C.D. Cal. 2006). In fact, whether or not both of the Quinoneses exercised control over the unpaid contributions, thus bringing them within the definition of "fiduciary" under ERISA, was the largest point of contention prior to *Bos*. When *Bos* was rendered, the question as to whether the Quinoneses were fiduciaries for purposes of § 523(a)(4) was resolved. 795 F.3d at 1009-11. Shortly thereafter, the Boards moved to dismiss the remaining claims with prejudice.

35

**\*\*End of Memorandum\*\***

## Court Service List

Jolene Kramer
Emily P. Rich
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway #200
Alameda, CA 94501

David N. Chandler
Law Offices of David N. Chandler
1747 4th St.
Santa Rosa, CA 95404

Jorge Edgard Quinones
Lidia Delvalle Quinones
164 Belle Avenue
Pleasant Hill, CA 94523

37